IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 1, 2024

**STATE OF TENNESSEE v. ORLANDO NICHOLS**

**Appeal from the Criminal Court for Shelby County**
**Nos. 20-03480, C2005623  Lee V. Coffee, Judge**

_____

**No. W2023-01183-CCA-R3-CD**

_____

The Defendant, Orlando Nichols, was convicted in the Shelby County Criminal Court of especially aggravated kidnapping and aggravated rape, Class A felonies, and received consecutive twenty-five-year sentences to be served at one hundred percent.  On appeal, the Defendant contends that (1) the time delay between the commission of the offenses and the issuance of the indictment violated his right to due process; (2) his effective fifty-year sentence is excessive; and (3) the evidence is insufficient to support his convictions.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JILL BARTEE AYERS, JJ., joined.

Gerald S. Green (on appeal) and Joseph McClusky (at trial), Memphis, Tennessee, for the appellant, Orlando Nichols.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lapone, Assistant Attorney General; Steve Mulroy, District Attorney General; and Dru Carpenter and J.D. Hamblen, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In October 2020, the Shelby County Grand Jury returned a two-count indictment, charging the Defendant with the especially aggravated kidnapping and the aggravated rape of the victim in November 2005.  The Defendant went to trial in May 2023.

At trial, Brandon Martin testified that in November 2005, he was eighteen years old and was in a romantic relationship with the victim. Mr. Martin and the victim were in high school and were living with the victim's sister, A.B., in the Poplar Place apartment complex.[1] On the night of November 26, Mr. Martin and A.B. were at the apartment, but the victim was not home. At some point, the victim telephoned and "frantically" asked Mr. Martin and A.B. to put some money underneath the mat outside their apartment door. Mr. Martin told the victim that they did not have any cash, so the victim hung up. Mr. Martin later heard the victim's car, which had a "distinct sound," pull up outside. He went to the apartment door and looked outside. The victim was sitting in the car, and a man was getting out of the car. Mr. Martin did not remember if the man was getting out of the driver's seat or the passenger's seat. Mr. Martin made eye contact with the man, and the man "took off."

Mr. Martin testified that he and A.B. got the victim out of the car and called 911. Mr. Martin looked for the man before the police arrived but did not find him. On June 16, 2009, the police showed Mr. Martin a six-photograph array. He selected two photographs as the possible perpetrator but was unable to make a positive identification. Mr. Martin said the victim was "a different person" after November 26, 2005.

On cross-examination, Mr. Martin testified that on the night of incident, the victim had "gone out to do some stuff." Earlier that day, Mr. Martin and the victim may have been "bickering, arguing, but not true fighting." After the victim's telephone call for money, Mr. Martin and A.B. were concerned because the victim's tone of voice and behavior were unusual. Mr. Martin acknowledged that when the victim's car pulled up outside, the victim was naked in the car. The victim screamed and said something to Mr. Martin, but he did not remember what she said. Mr. Martin and the victim eventually married but divorced.

The victim testified that in November 2005, she was a seventeen-year-old high school student and was living with Mr. Martin and her sister. On the night of November 26, the victim "went and hung out with a friend." When she returned to her apartment complex, she pulled her Saturn sedan into a parking space, got out of the car, and heard someone running. A man hit her on the head and knocked her down. He told her to get up and get into the car. The man said he had a gun and threatened to shoot the victim.

The victim testified that the man was African-American; about five feet, six inches tall; and weighed one hundred sixty pounds. He was wearing a white hoodie and white pants, and he kept his right hand in the pocket of his hoodie. The victim was "frazzled"

---

[1] In order to protect the victim's identity, we will refer to her sister by her sister's initials.

and thought he had a gun, so she did as she was told. The victim got into the driver's side and "scooted" over to the passenger's side. The man sat in the driver's seat, backed out of the parking space, and drove onto Kirby Parkway. He kept asking the victim for money, but she kept telling him that she did not have any money. The victim told the man that she had a bank debit card, so he drove her to an ATM at the Regions Bank on Poplar Avenue. The victim withdrew about $115 from her bank account. The man took the money, the victim's debit card, and the receipt.

The victim testified that the man drove back to her apartment complex but that he drove through her apartment complex to another apartment complex. He told her to get undressed and threatened to shoot her, so she took her off clothes. The man parked near some trees, crawled into the passenger's seat, and put his penis into her vagina. The victim said she did not know if he used a condom or if he ejaculated. He then made her "flip over" and "had sex with [her] that way." Someone was walking a dog nearby, so the man got back into the driver's seat and told the victim that she "needed to find him money." The victim telephoned her sister and asked her sister to put money underneath the mat outside their apartment door.

The victim testified that the man drove her back to her apartment and pulled into a parking space. Mr. Martin came outside and was "frantic" because he did not know what was happening. The man saw Mr. Martin and ran away. Mr. Martin got the victim out of the car and took her inside.

The victim testified that she had a physical examination at the Rape Crisis Center and that a nurse collected evidence for a sexual assault kit. The victim spoke with a male police investigator, and he asked if she had had consensual sex in the past seventy-two hours. The victim told him no. The investigator explained DNA evidence to the victim, so she told him that she had consensual sex with her friend, "Chad," on November 25. The victim acknowledged that she initially lied to the investigator but said, "He made it -- made me feel like I was -- like, I had done something wrong. I mean, I was only seventeen. I didn't even talk to my parents about having sex, so discussing anything with him was just -- it was extremely uncomfortable."

The victim testified that in June 2009, the Memphis Police Department (MPD) showed her a six-photograph array. She selected two photographs as the possible perpetrator but was unable to make a positive identification. In 2020, Sergeant Joshua Davis contacted her with additional information about her case and asked if she wanted to pursue her case. The victim told him yes. The State asked the victim how the assault had affected her, and she responded, "It's affected my whole life. Like, every single day I have thought about this. Every time I get in my car. I've done years of therapy. I have cameras

all around my home. I literally think about this too much." The victim said that she did not know the Defendant and that she did not have consensual sex with him.

On cross-examination, the victim testified that the man kept his hand in the pocket of his hoodie when he was driving and that she never saw a gun. Defense counsel asked how he was able to get his pants down with one hand in his pocket, and the victim said he was wearing sweatpants that he could pull down. The victim acknowledged that when she telephoned her sister, she did not tell her sister what was happening. The victim also acknowledged that the police asked her after the incident if the man penetrated her and that she told the police, "'I don't think so. It didn't feel like he did.'" The victim said she did not know what "penetrate" meant when she was seventeen years old.

A.B. testified that she was two and one-half years older than the victim and that she lived with the victim and Mr. Martin in an apartment in November 2005. On the night of November 26, the victim was away from the apartment, and A.B. and Mr. Martin were at the apartment with some of A.B.'s friends. The victim telephoned A.B. and asked A.B. to put money underneath the mat outside the front door. The victim sounded "desperate," but A.B. told the victim that she did not have any money. A.B. tried calling the victim back, but the victim would not answer her cellular telephone.

A.B. testified that she was concerned about the victim and that she and Mr. Martin kept looking out the windows for the victim. The victim finally arrived home. When she came into the apartment, she said that "'[h]e raped me'" and collapsed onto the floor.

A.B. testified that after November 26, the victim's behavior changed. The victim was anxious, stopped going out at night unless absolutely necessary, and was "constantly checking her security cameras" and "setting the alarm." The victim never spent another night in the apartment and never got back into her car. On cross-examination, A.B. testified that she did not see what occurred outside the apartment.

Sergeant Andra Dwayne Jones of the MPD testified that he was a uniform patrol officer in 2005, and that he responded to a criminal assault call on November 26. Sergeant Jones went to the victim's apartment and took a report, but he could not remember anything about the case. Officer Charles Cathey of the MPD testified that the victim's Saturn was towed to the MPD's impound lot on Klinke Avenue and that he processed the vehicle for evidence. He identified a photograph that appeared to show a debit card on the driver's floorboard.

Mr. Paul Pritt, who was retired from the MPD, testified that he formerly worked as an investigator for the Sex Crimes Bureau and that he was the lead investigator for this

case. The day after the incident, the victim and Mr. Martin came to the MPD and gave statements. The victim told Mr. Pritt that the perpetrator had "backed the vehicle in" at the ATM so that the victim, who was sitting in the passenger's seat, could use her debit card to obtain money. Mr. Pritt contacted Regions Bank, and the bank provided him with video of the ATM. The video confirmed the victim's story. The Tennessee Bureau of Investigation (TBI) obtained semen from the victim's sexual assault kit and uploaded the DNA profile into the CODIS database.[2] However, no immediate match was found. Another officer processed the victim's car for evidence, but the officer did not obtain fingerprints from the vehicle. The victim's cellular telephone also was processed for fingerprints, but no fingerprints were obtained. Mr. Pritt said that he ended up putting the case "on a back burner" but that he knew "we would get a hit in CODIS eventually somewhere down the road."

On cross-examination, Mr. Pritt testified that the victim's cellular telephone had been found outside a commercial building and was "tagged" as evidence. In 2005, the MPD did not have the technology to extract data from cellular telephones.

Sally DiScenza testified as an expert in sexual assault examination. She was a sexual assault nurse at the Rape Crisis Center in November 2005, and she examined the victim at 3:30 a.m. on November 27. The alleged assault occurred about 10:40 p.m. on November 26, and Ms. DiScenza noted in her report that the victim's demeanor was "controlled and cooperative." The victim claimed that the perpetrator hit her on the head and "'forced unprotected vaginal penetration.'" Ms. DiScenza examined the victim but did not see any injuries to the victim's head or genital area. Ms. DiScenza collected evidence for a sexual assault kit. The victim reported having consensual sex within four days of the alleged assault.

On cross-examination, Ms. DiScenza testified that "forced unprotected vaginal penetration" were her words, not necessarily the victim's words, and that the victim never mentioned a gun. Ms. DiScenza prepared a vaginal slide and saw sperm on the slide. She acknowledged that she could not say the victim's sexual encounter on the night of November 26 was forced or consensual based on the victim's physical examination.

In response to Ms. DiScenza's testimony that the victim never mentioned a gun, the State recalled Mr. Pritt to the stand. He testified that he asked the victim if the perpetrator was armed and that she answered, "'He said he was, but I never saw a gun.'" Mr. Pritt also

---

[2] CODIS is the acronym for the TBI's Combined DNA Index System. *State v. Cannon*, 254 S.W.3d 287, 293 (Tenn. 2008).

asked the victim if the perpetrator threatened her, and she said he repeatedly threatened to shoot her.

Sergeant Joshua Davis of the MPD testified that in 2020, he was assigned to the DNA Unit. He reviewed the victim's case and noticed that "the statute of limitations was coming up." He also noticed that a "CODIS hit" for the DNA in the victim's rape kit had identified the Defendant as the suspect in 2009. After the "hit," a police officer had collected a "confirmation swab" from the Defendant. The MPD then closed the case but failed to submit the case to the district attorney's office.

Sergeant Davis testified that he reviewed the two photograph arrays that the MPD had shown to Mr. Martin and the victim in June 2009. The Defendant's photograph was in both of the arrays, albeit in a different position, and Mr. Martin and the victim both had selected the Defendant's photograph as one of two possible suspects. Sergeant Davis also reviewed a VHS tape that had been provided by Regions Bank. The video had been recorded on a "multiplexer," so Sergeant Davis could only review the video "frame by frame." The video showed that at 10:43 p.m., the passenger's side of the victim's car, rather than the driver's side, was at the ATM and that the victim appeared to reach out of the car to access the ATM.

Sergeant Davis testified that given the amount of time that had passed since the alleged crimes, he met with the victim and asked if she wanted to move forward with the case. The victim immediately said yes. Although a confirmation swab had been collected from the Defendant in 2009, Sergeant Davis collected another confirmation swab from the Defendant on April 11, 2023.

On cross-examination, Sergeant Davis acknowledged that he did not become involved in this case until almost fifteen years after the alleged offenses occurred. He also acknowledged that during that time, law enforcement had learned to obtain valuable evidence from cellular telephones. He said that he tried to find a video multiplexer so that he could view the videotape "correctly" but that he was unable to find one due to the outdated technology. Sergeant Davis tried to find the Defendant but was unable to do so. He later learned the Defendant had moved to Nashville.

Lawrence James, a special agent forensic scientist for the TBI, testified as an expert in forensic biology and DNA analysis that he analyzed the evidence in the victim's sexual assault kit in January 2006. Microscopic examination of the victim's vaginal swabs showed the presence of sperm cells, and Special Agent James obtained a DNA profile from the cells. The DNA profile was a mixture of two contributors with one male being a major contributor and another individual being a minor contributor. Special Agent James

- 6 -

uploaded the DNA profile for the major contributor into CODIS. In 2009, the profile had a "hit" matching the Defendant. After the "hit," Special Agent James received a saliva sample from the Defendant and confirmed that the DNA from the victim's vaginal swabs matched the Defendant's DNA. In 2023, Special Agent James received a second saliva sample from the Defendant and again confirmed that the DNA from the victim's vaginal swabs matched the Defendant's DNA. On cross-examination, Special Agent James testified that he was unable to identify the minor contributor to the DNA mixture but that the minor contributor could have been the victim.

At the conclusion of Special Agent James's testimony, the State rested its case. The Defendant did not present any proof, and the jury convicted him as charged in the indictment of especially aggravated kidnapping and aggravated rape, Class A felonies. *See* Tenn. Code Ann. §§ 39-13-305(b)(1), -502(b).

## ANALYSIS

The Defendant raises three issues in his appellate brief: (1) that the time delay between the commission of the offenses and the filing of the indictment violated his right to due process; (2) that his effective sentence is excessive; and (3) that the evidence is insufficient to support his convictions. As noted by the State, though, the Defendant's brief is grossly inadequate. His statement of the case provides as follows: "This case comes before this court as a direct appeal subsequent to the indictment, trial, conviction, sentencing, Motion for New Trial and the Order Denying the Motion for New Trial from the Criminal Court of Tennessee for the Thirtieth Judicial District at Memphis, Honorable Lee V. Coffee presiding." Moreover, as noted by the State, the facts section of Defendant's brief is a summary of the prosecutor's opening statement to the jury and does not contain any citations to the record. In the argument section of his brief, Defendant's issue on preindictment delay relies on the four-prong test set out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), which is used to analyze alleged speedy trial violations, not preindictment delay. Additionally, his issues on sentencing and sufficiency span a total of just more than two pages with virtually no argument.

Tennessee Rule of Appellate Procedure 27(a) provides that a defendant's brief shall contain, among other requirements, "[a] statement of the case, indicating briefly the nature of the case, the course of proceedings, and its disposition in the court below"; "[a] statement of facts, setting forth the facts relevant to the issues presented for review with appropriate references to the record"; and an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on[.]" Tenn. R. App. P.

27(a)(5), (6), (7)(A). Based on the Defendant's deficient brief, the State urges us to conclude that his issues are waived, and we are tempted to do so. However, we are also mindful that the Defendant is serving a fifty-year sentence at one hundred percent for especially aggravated kidnapping and aggravated rape. Therefore, while we could treat his issues as waived due to his failure to comply with Tennessee Rule of Appellate Procedure (27)(a), we choose to address his issues briefly. *See State v. Potts*, No. M2020-01623-CCA-R3-CD, 2022 WL 2348233, at *22 (Tenn. Crim. App. June 29, 2022) ("When issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review, we will not engage in an exhaustive review of the merits thereof."), *perm. app. denied*, (Tenn. Dec. 14, 2022).

## I. Preindictment Delay

First, the Defendant contends that the almost fifteen-year delay between the commission of the offenses and the filing of the indictment violated his right to due process. The State argues that the Defendant has waived plenary review of this issue and that he is not entitled to plain error relief. We agree with the State.

Generally, the accused must prove the following prerequisites, also known as the *Marion-Dykes* test, to establish a due process violation stemming from a preindictment delay: (1) there was a delay; (2) the accused sustained actual prejudice as a direct and proximate result of the delay; and (3) the State caused the delay in order to gain a tactical advantage over the accused or to harass the accused. *State v. Utley*, 956 S.W.2d 489, 495 (Tenn. 1997) (citing *United States v. Marion*, 404 U.S. 307, 324-25 (1971), and *State v. Gray*, 917 S.W.2d 668, 671 (Tenn. 1996)); *see also State v. Carico*, 968 S.W.2d 280, 284-85 (Tenn. 1998).

Ordinarily, we review a trial court's ruling on a motion to dismiss the indictment for an abuse of discretion. *State v. Harris*, 33 S.W.3d 767, 769-70 (Tenn. 2000). However, Tennessee Rule of Criminal Procedure 12(b)(2) provides that defenses and objections based on "a defect in the institution of the prosecution" or "a defect in the indictment" must be raised before trial. Tenn. R. Crim. P. 12(b)(2)(A), (B). The federal counterpart to Tennessee Rule of Criminal Procedure 12(b)(2) lists "preindictment delay" as a defect in instituting the prosecution. Fed. R. Crim. P. 12(b)(3)(A)(ii). "Unless the court grants relief for good cause, a party waives any defense, objection, or request by failing to comply with [Rule 12(b)(2)]." Tenn. R. Crim. P. 12(f).

The Defendant acknowledges that he did not file a pretrial motion to dismiss the indictment but requests that we review the issue anyway. The Defendant's failure to file a

pretrial motion alleging preindictment delay waives the issue.[3]  *See State v. Lindsey*, No. W2018-01987-CCA-R3-CD, 2020 WL 774047, at \*6 (Tenn. Crim. App. Feb. 14, 2020); *State v. Coleman*, No. W2015-01925-CCA-R3-CD, 2016 WL 7687124, at \*7 (Tenn. Crim. App. June 15, 2016).  Therefore, we are limited to plain error review.

We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error).  Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial."  *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

We conclude that no clear and unequivocal rule of law was breached in this case. Although the proof at trial established that there was an almost fifteen-year delay between the commission of the offenses and the filing of the indictment, the reason for the delay was oversight by the MPD in failing to submit the case to the prosecutor in 2009, when the DNA in the victim's sexual assault kit was found to match the Defendant's DNA.  The State did not cause the delay in order to gain a tactical advantage over the Defendant or to harass him.  Moreover, the Defendant has not shown that his defense was prejudiced by the delay.  He does not allege that witnesses were unavailable or that evidence was lost. He does claim that he was prejudiced by the delay because he "suffered a long pretrial incarceration," but the record reflects that he was not in custody when the indictment was returned in October 2020.  Therefore, the Defendant cannot establish a due process violation under the *Marion-Dykes* test, and he is not entitled to plain error relief.

---

[3] We note that the Defendant also did not raise this issue in his motion for new trial.  However, he was not required to do so because the remedy for a defective indictment is dismissal of the indictment rather than a new trial.  *See* Tenn. R. App. P. 3(e).

## II. Sentencing

Next, the Defendant claims that his effective fifty-year sentence is excessive because the trial court should have sentenced him based on his criminal history at the time of the offenses, not his criminal history at the time of the sentencing hearing. He also suggests that the trial court improperly imposed consecutive sentencing. The State argues that the trial court properly sentenced the Defendant. We agree with the State.

No witnesses testified at sentencing. The State introduced into evidence certified judgments of Defendant's 2009 conviction for three counts of aggravated assault and one count of misdemeanor theft and certified judgments of adjudication in California juvenile court for aggravated burglary, aggravated robbery, and a rape that the Defendant committed when he was twelve years old. The State also introduced into evidence the Defendant's presentence report, which showed that he had numerous misdemeanor convictions including eight convictions of driving on a suspended, canceled, or revoked license. His Strong-R assessment classified his risk to reoffend as low.

The trial court found that the thirty-five-year-old Defendant was a Range I, standard offender and applied four enhancement factors to his convictions, including that he had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range. *See* Tenn. Code Ann. § 40-35-114(1). The trial court gave the enhancement factors great weight and found that no mitigating factors were applicable. The trial court sentenced the Defendant to twenty-five years, the maximum punishment in the range, for each conviction. *See* Tenn. Code Ann. § 40-35-112(a)(1). The trial court also ordered that Defendant serve the sentences consecutively for a total effective sentence of fifty years to be served at one hundred percent. *See* Tenn. Code Ann. § 40-35-501(i)(2)(C), (F).

This court reviews the length, range, and manner of service of the sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the *Bise* standard to consecutive sentencing determinations). The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the

presence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant on his own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

Sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

*Id*. at § 40-35-103(1). In addition, "[t]he sentence imposed should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" *Id*. at § 40-35-103(2), (4). A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citation omitted). The defendant bears the burden of proving that the sentence is improper. Tenn. Code Ann. § 40-35-101, Sentencing Comm'n Cmts.

The Defendant contends, without any authority, that the trial court should have sentenced him based on his criminal history at the time of the offenses for which he was convicted. However, this court has previously held that trial courts "can consider criminal convictions or any other criminal behavior which occurred prior to the sentencing hearing as being 'a previous history of criminal convictions or criminal behavior' under Tenn. Code Ann. § 40-35-114(1), regardless of whether the convictions or behavior occurred before or after the criminal conduct under consideration." *State v. Jordan*, 116 S.W.3d 8, 24 (Tenn. Crim. App. 2003) (quoting *State v. Waters*, No. 01-C–01-9106-CR-00158, 1992 WL 28457, at *3 (Tenn. Crim. App. Feb. 20, 1992)). Therefore, we find no merit to this claim.

Regarding consecutive sentencing, a trial court may order that multiple sentences run consecutively if it finds by a preponderance of evidence that any one of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) applies, including the two factors that the trial court applied in this case: the Defendant is an offender whose record of criminal activity is extensive, and the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. *See* Tenn. Code Ann. § 40-35-115(b)(2), (4). Regarding the first factor, the trial court found that the Defendant began committing crimes when he was twelve years old and that he has been committing crimes throughout his adult life. Regarding the second factor, that the Defendant is a dangerous offender, the trial court specifically addressed the required "*Wilkerson* factors" and found that an extended sentence was necessary to protect the public against further criminal conduct by the Defendant and that the consecutive sentences reasonably related to the severity of the offense committed. *See State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995). The Defendant does not contest the trial court's finding that his criminal history was extensive or that he was a dangerous offender, either of which justifies consecutive sentencing. *See State v. Farley*, No. M2003-02826-CCA-R3-CD, 2005 WL 366890, at *11 (Tenn. Crim. App. Feb. 16, 2005) (noting that the factors in Tennessee Code Annotated section 40-35-115(b) are listed in the disjunctive "or"; therefore, the trial court need find only one factor to impose consecutive sentencing). Accordingly, we conclude that his effective fifty-year sentence is not excessive.

## III.  Sufficiency of the Evidence

Finally, the Defendant claims that the evidence is insufficient to support his convictions because the jury could have found that the acts were consensual. The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the

weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

As charged in this case, especially aggravated kidnapping is false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-305(a)(1). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* at § 39-13-302(a). Aggravated rape is "unlawful sexual penetration of a victim by the defendant" where "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon." Tenn. Code Ann. § 39-13-502(a)(1).

Taken in the light most favorable to the State, the evidence shows that the Defendant ran up to the victim after she got out of her car and that he hit her on the head, knocking her down. He told her that he had a gun, threatened to shoot her, and ordered her to get back into her car. The Defendant kept his right hand in the pocket of his hoodie so that the victim thought he had a firearm, and she did as she was told. The Defendant demanded money from the victim. She told him that she did not have any money but that she had a debit card, so he drove her to an ATM and backed up her car to the ATM so that she could withdraw money from the passenger's side. The Defendant then drove her to a secluded area in an apartment complex next to her own apartment complex and penetrated her vagina with his penis. The Defendant drove the naked victim back to her apartment and fled the scene. During the victim's physical examination, sperm were found on her vaginal swabs, and the DNA profile for the perpetrator was uploaded into CODIS. Four years later, a "hit" on the profile matched the Defendant. That match was confirmed with saliva samples collected from the Defendant in 2009 and 2023. The victim testified that she did not have consensual sex with the Defendant, and it was the jury's prerogative as the trier of fact to evaluate the credibility of the witnesses. Thus, the evidence is sufficient to support the convictions.

## CONCLUSION

Based upon our review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE